UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPRO-MED SYSTEMS, INC. (d/b/a RMS MEDICAL PRODUCTS),<br><br>Plaintiff,<br><br>v.<br><br>EMED TECHNOLOGIES CORPORATION,<br><br>Defendant. | No. 2:13-cv-01957-TLN-CKD<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SEVER** |

This matter is before the Court pursuant to Defendant and Counterclaimant EMED Technologies Corporation's ("EMED") Motion to Sever. (ECF No. 160.) Plaintiff and Counterdefendant Repro-Med Systems, Inc. (d/b/a RMS Medical Products) ("RMS") filed an opposition, (ECF No. 162), and Defendant filed a reply, (ECF No. 163). For the reasons set forth below, the Court hereby DENIES Defendant's Motion to Sever. (ECF No. 160.)

///
///
///
///
///

1

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

The parties in this case are competitors in the field of medical devices used for the subcutaneous infusion of drugs. (ECF No. 14 ¶ 20; ECF No. 21 ¶ 26.) Specifically, this lawsuit concerns portable syringe infusion systems used to administer immunoglobulin to patients suffering from primary immunodeficiency diseases. (ECF No. 14 ¶ 8; ECF No. 21 ¶ 12.)

        A.     RMS's Products

RMS is a company that specializes in developing and manufacturing portable medical devices. (ECF No. 14 ¶ 8.) RMS alleges since the 1980s it has been a leader in the development of completely portable syringe infusion systems, which give patients the freedom to infuse anywhere. (ECF No. 14 ¶ 8.) RMS sells and markets a variety of devices for use in the subcutaneous infusion of drugs, which can generally can be broken down into four groups: (1) FREEDOM60® Infusion Pump ("Freedom60 Pump"), (2) FREEDOM60® Precision Flow Rate Tubing ("Freedom60 Tubing"), (3) extension tubing, and (4) HIgH-Flo Safety Needle Sets. (ECF No. 14 ¶ 9.)

There are two basic infusion pump designs: constant pressure and constant flow. (ECF No. 14 ¶ 10.) RMS's Freedom60 Pump is a constant pressure pump, which pumps fluid at a constant pressure of 13.5psi. (ECF No. 14 ¶ 10.) Constant flow pumps, on the other hand, always pump at the same flow rate and use increasing pressures to compensate for any restrictions to flow rate. (ECF No. 14 ¶ 10.) RMS alleges the Freedom60 Pump has many advantages over conventional constant flow pumps, but is extremely sensitive to peripheral accessories, such as tubing and needles, that are connected to it. (ECF No. 14 ¶ 10.) RMS alleges that its Freedom60 Pump was engineered for use exclusively with its Freedom60 Tubing. (ECF No. 14 ¶ 11.) RMS alleges the Freedom60 Tubing, when used in conjunction with the Freedom60 Pump, safely and accurately controls the flow rate of drugs delivered by the Freedom60 Pump to the patient. (ECF No. 14 ¶ 11.) According to RMS, RMS's Freedom60 Tubing is the only flow control tubing on the market that has been properly engineered, tested, and determined to be safe and effective for use with the Freedom60 Pump. (ECF No. 14 ¶ 11.)

To prevent unintended use of non-compatible flow control tubing on the Freedom60

Pump, RMS alleges it designed its Freedom60 Pump to only accept RMS's specially engineered flow control tubing utilizing RMS's proprietary luer disk connection. (ECF No. 14 ¶ 12.) In addition to incorporation of the proprietary luer disk technology, RMS also alleges it informs its customers about the potential dangers of using non-compatible flow rate tubing with its Freedom60 Pump, which include serious and life-threatening side effects. (ECF No. 14 ¶ 12.) RMS further alleges that in 1994, RMS obtained United States Food and Drug Administration ("FDA") 510K clearance for its Freedom60 Pump. (ECF No. 14 ¶ 13.) Specifically, RMS alleges the Freedom60 Pump was cleared for use with the Freedom60 Tubing. (ECF No. 14 ¶ 13.)

RMS also manufactures extension tubing to be used in conjunction with the Freedom60 Tubing. (ECF No. 14 ¶ 14.) The extension tubing serves the limited function of allowing extra distance between the Freedom60 Pump and the patient, and RMS alleges it must be used in conjunction with the Freedom60 Tubing in order to ensure safe and effective fluid delivery by the Freedom60 Pump. (ECF No. 14 ¶ 14.) Finally, RMS sells HIgH-Flo Safety Needle Sets for use in conjunction with its Freedom60 Pump and Freedom60 Tubing. (ECF No. 14 ¶ 15.) RMS alleges the Freedom60 Pump, Freedom60 Tubing, and HIgH-Flo Safety Needle Sets are used for Subcutaneous Immunoglobulin ("SCIg") therapy, which is a method for administering immunoglobulin through a small needle in the subcutaneous tissue, or fatty tissue just under the skin. (ECF No. 14 ¶ 16.)

B. EMED's Products

EMED was founded in 1991 and has developed innovative medical products for over two decades. (ECF No. 21 ¶ 10.) EMED is a direct competitor with RMS in the field of medical devices for use in the subcutaneous infusion of drugs, specifically for SCIg therapy. (ECF No. 21 ¶¶ 12, 26.) Like RMS, EMED sells and markets a variety of devices for use in the subcutaneous infusion of drugs, including pumps, extension tubing sets, and safety needle sets. (ECF No. 21 ¶ 13.)

EMED alleges it first developed needle sets specifically optimized for infusion of immunoglobulin ("SCIg Needle Sets") in 2005. (ECF No. 21 ¶ 17.) EMED alleges it was

initially the only manufacturer and supplier of SCIg Needle Sets. (ECF No. 21 ¶ 17.) Around 2007 to 2008, EMED alleges it began to incorporate additional innovative safety design features into its needle sets ("SCIg Safety Needle Sets") in order to protect patients and medical practitioners from inadvertent needle sticks. (ECF No. 21 ¶¶ 18–19.) In or around July 2008, EMED alleges it began selling SCIg Safety Needle Sets to customers. (ECF No. 21 ¶ 20.) Like the SGIg Needle Sets, EMED alleges it was also the first manufacturer and supplier of SCIg Safety Needle Sets. (ECF No. 21 ¶ 19.)

On August 6, 2013, the United States Patent and Trademark Office ("USPTO") issued EMED Patent No. 8,500,703 ("'703 Patent") for a safety design feature it developed for its SGIg Safety Needle Sets. (ECF No. 21 ¶ 21.) The '703 Patent issued from Provisional Application No. 61/130,880 and related Patent Application No. 12/187,256. (ECF No. 21 ¶ 21.) EMED alleges the invention claimed in the '703 Patent allows for the safe removal of needles from patients and the safe disposal of needles and needle sets. (ECF No. 21 ¶ 22.) Specifically, EMED alleges the invention "solves the needle safety problem by sheathing the needle within a protective pair of folding wings upon removal." (ECF No. 21 ¶ 22.)

In addition to selling needle sets, EMED alleges it has also developed Infusion Extension Sets and an Infusion Pump. (ECF No. 21 ¶ 23.) EMED alleges that it manufactures and sells Infusion Extension Sets[1] that were cleared by the FDA in January 1994 and can be used with any infusion apparatus and application. (ECF No. 21 ¶ 23.) More recently, EMED alleges it has developed a variable rate control Infusion Extension Set, the "VersaRate" set, which offers significant clinical benefits to patients. (ECF No. 21 ¶ 23.) EMED has also developed the SCIg60 Infusion Pump ("SCIg60 Pump"), which it alleges is an improved version of an infusion pump distributed and used in the market for the last twenty years. (ECF No. 21 ¶ 24.) According to RMS, however, the SCIg60 Pump uses a coiled spring, which results in higher pressures at the beginning of the infusion and lower pressures at the end, in comparison to the Freedom60 Pump, which maintains a constant pressure from start to finish. (ECF No. 14 ¶ 21.) While the SCIg60 Pump has obtained European and Canadian registration, it is currently under review by the FDA

---

[1] It appears that EMED refers to its tubing as "Infusion Extension Sets." (*See* ECF No. 14 ¶ 23.)

4

and thus not sold in the United States. (ECF No. 21 ¶ 24.)

        C.       <u>The Parties' Claims</u>

RMS and EMED both claim that the other party has made false and deceptive statements regarding either its own or the other party's products. For example, RMS alleges that EMED sells "knock-off" flow control tubing that is non-compatible with its Freedom60 Pump and that EMED specifically and improperly markets its tubing as equivalent to Freedom60 Tubing. (ECF No. 14 ¶ 22.) RMS also alleges that EMED falsely and deceptively refers to its knock-off flow control tubing as an "extension set," even though it is only a couple of inches in length. (ECF No. 14 ¶¶ 23–24.) Moreover, RMS alleges that in early 2012, EMED began falsely advertising that its SCIg60 Pump and needle sets were equivalent, and even superior, to RMS's Freedom60 Pump and HIgH-Flo Safety Needle Sets. (ECF No. 14 ¶ 26.) For example, RMS claims that EMED misleadingly stated that "RMS sets do not offer any improved fluidics or higher flow than EMED sets" and that "[t]he Freedom60 pump is being operated around the limits of its ratings which make it unable to perform adequately with longer sets." (ECF No. 14 ¶ 27.) Further, RMS alleges that EMED falsely informed RMS's customers, suppliers, and buyers that RMS's needles are less smooth than EMED's needles and contain imperfections. (ECF No. 14 ¶ 30.)

Conversely, EMED alleges that RMS made misrepresentations regarding EMED's Infusion Extension Sets, Infusion Pump, and SCIg Safety Needle Sets. (ECF No. 21 at 22–36.) Specifically, EMED alleges that RMS falsely represented to its customers that using non-RMS tubing with the Freedom60 Pump could result in uncontrolled flows that could lead to patient injury or death. (ECF No. 21 ¶ 62.) EMED alleges that its Infusion Extension Sets can be used with the Freedom60 Pump, and that RMS's misrepresentations directly impacted EMED's business. (ECF No. 21 ¶¶ 65–66.) Moreover, EMED alleges that RMS falsely represented that EMED's SCIg60 Pump is unsafe, can cause serious injury, and is not reimbursable by Medicare. (ECF No. 21 ¶¶ 80–90.) EMED further alleges that RMS falsely claims that its HIgH-Flo Safety Needle Sets have better flow characteristics than EMED's SCIg Safety Needle Sets, (ECF No. 21 ¶ 36), and that SCIg Safety Needle Sets are dull and damage patients' skin, (ECF No. 21 ¶ 51.)

In addition to the parties' numerous alleged misrepresentations, EMED also contends that

1  RMS has infringed the '703 patent. (ECF No. 21 at 36.) On May 1, 2013, EMED sent RMS a letter accusing RMS's HIgH-Flo Safety Needle Sets of infringing the claims of filed Patent Application No. 12/187,256. (ECF No. 10 ¶ 38.) The letter demanded that RMS discontinue making and selling its HIgH-Flo Safety Needle Sets. (ECF No. 10 ¶ 38.) On August 21, 2013, EMED sent RMS another letter, informing RMS that the '703 Patent had issued and reiterating EMED's previous demands, and further threatening to seek treble damages for willful infringement. (ECF No. 10 ¶ 40.)

In response to EMED's letters, RMS filed this suit on September 20, 2013 seeking a declaratory judgment of non-infringement of the '703 Patent and a declaratory judgment of patent invalidity of the '703 Patent. (ECF No. 2 ¶¶ 8–11.) On December 6, 2013, RMS filed a first amended complaint ("FAC") against EMED again seeking a declaratory judgment of non-infringement of the '703 Patent and a declaratory judgment of patent invalidity of the '703 Patent, but also adding claims for false advertising, trade libel, defamation, interference with prospective economic relationships, and unfair competition. (ECF No. 14.) On January 7, 2014, EMED filed an answer to RMS's FAC, asserting counterclaims of patent infringement, false advertising, trade libel, defamation, interference with prospective economic relationships, and unfair competition. (ECF No. 21.)

### D. USPTO Reexamination Proceeding

The '703 Patent is currently the subject of a USPTO reexamination proceeding. (ECF No. 160-2 ¶ 3.) According to EMED's counsel, on or about November 17, 2017,[2] EMED filed an appeal of the reexamination decision. (ECF No. 163-1 ¶ 4.) EMED contends this appeal will likely take 12 to 24 months to complete. (ECF No. 163-1 ¶ 4.) If that decision is not in EMED's favor, EMED states it will further appeal to the Federal Circuit. (ECF No. 163-1 ¶ 5.) EMED estimates this subsequent appeal would likely take another 12 to 18 months to complete. (ECF No. 163-1 ¶ 5.) Due to the length of time this patent re-examination can take, EMED now moves to sever the patent claims from the rest of the case. (ECF No. 160 at 5.)

---

[2] The Court is perplexed as to how Mr. Ramey stated in his declaration EMED filed an appeal on November 17, 2017, when his declaration was signed and filed with the court on October 19, 2017. (*See* ECF No. 163-1.)

## II. STANDARD OF LAW

Rule 21 permits a court to "sever any claim against a party." Fed. R. Civ. P. 21. A court has broad discretion in determining whether to sever claims under Rule 21. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1992). "There is no established test in the Ninth Circuit for when a district court should exercise its broad discretion and sever a claim under Rule 21." *Arcure v. Cal. Dep't. of Developmental Servs.*, No. 1:13-cv-00541-LJO-BAM, 2014 U.S. Dist. LEXIS 11798, at *6 (E.D. Cal. Jan. 30, 2014). "Claims may be severable under Rule 21 if they arise from different factual situations or pose different legal questions." *Khanna v. State Bar of Cal.*, No. C-07-2587 EMC, 2007 U.S. Dist. LEXIS 59945, at *2 (N.D. Cal. Aug. 7, 2007). Claims may also be severed "if it will serve the ends of justice and further the prompt and efficient disposition of litigation." *Id.* "Fairness is a critical consideration in determining whether severance is appropriate," and therefore it must be determined whether any party would suffer prejudice. *Pena v. McArthur*, 889 F. Supp. 403, 407 (E.D. Cal. 1994). "As a general matter, Rule 21 severance creates two discrete, independent actions, which then proceed as separate suits for the purpose of finality and appealability." *Gaffney v. Riverboat Servs. of Ind.*, 451 F.3d 424, 441 (7th Cir. 2006).

In determining whether to sever a claim under Rule 21, a court may consider the following factors: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *SEC v. Leslie*, No. 07-3444, 2010 U.S. Dist. LEXIS 76826, at *10–11 (N.D. Cal. July 29, 2010) (quoting *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999)). "In addition, 'the court typically will deny a request that comes so late in the litigation that it will delay the case or prejudice any of the parties to the action.'" *Id.* at 11 (quoting *City of Syracuse v. Onondaga County*, 464 F.3d 297, 308 (2d Cir. 2006)).

///

///

### III. ANALYSIS

EMED moves to sever both RMS's and its own patent claims, arguing that severance "would aid convenience and fairness to the Court and parties, particularly because the average inter partes reexamination takes roughly three years to complete." (ECF No. 160 at 5.) EMED further argues that the patent and non-patent claims "involve different issues, facts, law, witnesses, and proof." (ECF No. 160 at 4.) However, in EMED's four-page brief (that is approximately one page when the footnotes are removed), EMED offers no explanation as to how the patent and non-patent claims involve different issues, facts, law, witnesses, and proof. EMED's five-sentence reply brief offers the Court no further assistance. (*See* ECF No. 163 at 2.)

RMS's two-page opposition brief fares slightly better. (*See* ECF No. 162.) First, RMS argues that the Court should deny EMED's motion to sever because many of the non-patent claim allegations relate to the patent claim allegations. (ECF No. 162 at 3.) RMS maintains that all of the claims in this case revolve around the advertising and selling of RMS's and EMED's SCIg therapy products and thus present common questions of law and fact, arise out of the same transactions and occurrences, and rely on the same witnesses and documentary proof. (ECF No. 162 at 3.) Second, RMS argues that trying the two sets of claims separately will not promote judicial economy, but will only multiply the parties' expenses and prolong the litigation. (ECF No. 162 at 3.) RMS reasons that this case has already gone through extensive discovery and motion practice over the last four years and that granting the motion will require the Court and the parties to reset and implement a new strategy to manage two separate lawsuits, rather than one. (ECF No. 162 at 3.) Third, RMS argues it would be substantially prejudiced by a severance as it has devoted substantial time and money over the last four years under the assumption that all claims would be litigated together. (ECF No. 162 at 3.)

The Court declines to sever RMS's and EMED's patent claims. Although RMS's and EMED's false advertising and various other state law claims arise out of different occurrences and do not raise common issues of law with RMS's and EMED's patent claims, they do raise common issues of fact because both RMS's and EMED's patent and non-patent claims derive from their infusion systems used for SCIg therapy. Specifically, multiple of RMS's and EMED's

non-patent claims directly relate to RMS's and EMED's safety needle sets, which are at issue in the patent claims.  For example, RMS alleges that EMED falsely informed RMS's customers, suppliers, and buyers that RMS's needles are less smooth than EMED's needles and contain imperfections.  (ECF No. 14 ¶ 30.)  Additionally, EMED alleges that RMS falsely claims that its HIgH-Flo Safety Needle Sets have better flow characteristics than EMED's SCIg Needle Sets, (ECF No. 21 at 22), and that SCIg Safety Needle Sets are dull and damage patients' skin, (ECF No. 21 at 26.)  Therefore, RMS's and EMED's claims present common questions of fact relating to their needle sets and will likely include overlap of witnesses and documentary proof.

Moreover, the Court finds that severance would not facilitate settlement or judicial economy.  This case began in September 2013 and has already gone through extensive discovery and motion practice, including three preliminary injunction motions.  Given the nature of the claims and the motions filed, "the Court has considerable doubt that severance will increase the chance of settlement in this long-running and bitterly contested litigation."  *SEC v. Leslie*, 2010 U.S. Dist. LEXIS 76826, at *14.

Finally, EMED has not demonstrated that prejudice would be avoided if severance were granted.  Although EMED argues that this case will be prolonged even further due to the USPTO reexamination appeals process, this is at the fault of EMED who has stated it will continue to file appeals and prolong this litigation.  Moreover, EMED was well aware that the patent claims could take longer to litigate since the inception of this litigation.  Yet, it chose to move for severance over four years after this litigation began.  Severing the claims at this late stage in litigation would simply be unfair to RMS, who "has devoted substantial time and money . . . under the assumption that all claims would be litigated together."  (ECF No. 162 at 3.)  Therefore, the Court finds that severance is not appropriate.  Accordingly, the Court denies EMED's Motion to Sever.

### IV. CONCLUSION

For the foregoing reasons, the Court hereby DENIES EMED's Motion to Sever.  (ECF No. 160.)

///

///

IT IS SO ORDERED.

Dated: February 11, 2019

Troy L. Nunley
United States District Judge