1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    REPRO-MED SYSTEMS, INC.,              No. 2:13-cv-01957-TLN-CKD

12                Plaintiff,

13          v.                              **ORDER DENYING MOTION FOR
                                            PRELIMINARY INJUNCTION**
14    EMED TECHNOLOGIES
      CORPORATION,
15
                  Defendant.
16

17

18          This matter is before the Court on Plaintiff and Counter Defendant Repro-Med Systems,

19    Inc.'s (d/b/a RMS Medical Products) ("RMS") motion for a reciprocal preliminary injunction.

20    (ECF No. 152.)  Defendant and Counter Claimant EMED Technologies Corporation ("EMED")

21    opposes the motion.  (ECF No. 157.)  For the reasons set forth below, RMS's motion for a

22    preliminary injunction (ECF No. 152) is DENIED.

23    ///

24    ///

25    ///

26    ///

27

28    ///

                                              1

# I. FACTUAL BACKGROUND

The parties in this case are competitors in the field of medical devices used for the subcutaneous infusion of drugs. (ECF No. 14 ¶ 20; ECF No. 21 ¶ 26.) Specifically, this lawsuit concerns portable syringe infusion systems used to administer immunoglobulin to patients suffering from primary immunodeficiency diseases. (ECF No. 14 ¶ 8; ECF No. 21 ¶ 12.) This treatment is known as Subcutaneous Immunoglobulin ("SCIg"), and requires the infusion of human plasma and antibodies into the patient. (ECF No. 152-1 at 4.)

## A. RMS's Products

RMS is a company that specializes in developing and manufacturing portable medical devices. (ECF No. 14 ¶ 8.) RMS alleges since the 1980s it has been a leader in the development of completely portable syringe infusion systems, which give patients the freedom to infuse anywhere. (ECF No. 14 ¶ 8.) RMS sells a variety of devices for use in the subcutaneous infusion of drugs, which can generally be broken down into four groups: (1) FREEDOM60® Infusion Pump ("Freedom60 Pump"), (2) FREEDOM60® Precision Flow Rate Tubing ("Freedom60 Tubing"), (3) extension tubing, and (4) HIgH-Flo Safety Needle Sets. (ECF No. 152-1 at 4; ECF No. 14 ¶ 9.)

There are two basic infusion pump designs: constant pressure and constant flow. (ECF No. 14 ¶ 10.) RMS's Freedom60 Pump is a constant pressure pump, which pumps fluid at a constant pressure of 13.5psi. (ECF No. 14 ¶ 10.) This is contrasted with constant flow pumps, which always pump at the same flow rate and which must use increasing pressures to compensate for any restrictions to flow rate. (ECF No. 14 ¶ 10.) RMS alleges the Freedom60 Pump has many advantages over conventional constant flow pumps, but is extremely sensitive to peripheral accessories, such as tubing and needles, that are connected to it. (ECF No. 14 ¶ 10.) RMS alleges that its Freedom60 Pump was engineered for use exclusively with its Freedom60 Tubing. (ECF No. 14 ¶ 11.) RMS alleges the Freedom60 Tubing, when used in conjunction with the Freedom60 Pump, safely and accurately controls the flow rate of drugs delivered by the Freedom60 Pump to the patient. (ECF No. 14 ¶ 11.) According to RMS, RMS's Freedom60 Tubing is the only flow control tubing on the market that has been properly engineered, tested,

1    and determined to be safe and effective for use with the Freedom60 Pump.  (ECF No. 14 ¶ 11.)

2          To prevent unintended use of non-compatible flow control tubing on the Freedom60

3    Pump, RMS alleges it designed its Freedom60 Pump to only accept RMS's specially engineered

4    flow control tubing utilizing RMS's proprietary luer disk connection.  (ECF No. 14 ¶ 12.)  In

5    addition to incorporation of the proprietary luer disk technology, RMS also alleges it informs its

6    customers about the potential dangers of using non-compatible flow rate tubing with its

7    Freedom60 Pump, which include serious and life-threatening side effects.  (ECF No. 14 ¶ 12.)

8    RMS further alleges that in 1994, RMS obtained United States Food and Drug Administration

9    ("FDA") 510K clearance for its Freedom60 Pump.  (ECF No. 14 ¶ 13.)  Specifically, RMS

10   alleges the Freedom60 Pump was cleared for use with the Freedom60 Tubing.  (ECF No. 14 ¶

11   13.)

12         RMS also manufactures extension tubing to be used in conjunction with the Freedom60

13   Tubing.  (ECF No. 14 ¶ 14.)  The extension tubing serves the limited function of allowing extra

14   distance between the Freedom60 Pump and the patient, and RMS alleges it must be used in

15   conjunction with the Freedom60 Tubing in order to ensure safe and effective fluid delivery by the

16   Freedom60 Pump.  (ECF No. 14 at 4.)  Finally, RMS sells HIgH-Flo Safety Needle Sets for use

17   in conjunction with its Freedom60 Pump and Freedom60 Tubing.  (ECF No. 14 at 5.)  RMS

18   alleges the Freedom60 Pump, Freedom60 Tubing, and HIgH-Flo Safety Needle Sets are used for

19   SCIg therapy, which is a method for administering immunoglobulin through a small needle in the

20   subcutaneous tissue, or fatty tissue just under the skin.  (ECF No. 14 at 5.)

21         B.  EMED's Products

22         EMED was founded in 1991 and has developed medical products for over two decades.

23   (ECF No. 21 ¶ 10.)  EMED is a direct competitor with RMS in the field of medical devices for

24   use in the subcutaneous infusion of drugs, specifically for SCIg therapy.  (ECF No. 21 ¶¶ 12, 26.)

25   Like RMS, EMED sells and markets a variety of devices for use in the subcutaneous infusion of

26   drugs, including pumps, extension tubing sets, and safety needle sets.  (ECF No. 21 ¶ 13.)

27         EMED alleges it first developed needle sets specifically optimized for infusion of

28   immunoglobulin ("SCIg Needle Sets") in 2005.  (ECF No. 21 ¶ 17.)  EMED alleges it was

initially the only manufacturer and supplier of SCIg Needle Sets. (ECF No. 21 ¶ 17.) Around 2007 to 2008, EMED alleges it began to incorporate additional innovative safety design features into its needle sets ("SCIg Safety Needle Sets") in order to protect patients and medical practitioners from inadvertent needle sticks. (ECF No. 21 ¶¶ 18–19.) In or around July 2008, EMED alleges it began selling SCIg Safety Needle Sets to customers. (ECF No. 21 ¶ 20.) Like the SGIg Needle Sets, EMED alleges it was also the first manufacturer and supplier of SCIg Safety Needle Sets. (ECF No. 21 ¶ 19.)

On August 6, 2013, the United States Patent and Trademark Office ("USPTO") issued EMED Patent No. 8,500,703 ("'703 Patent") for a safety design feature it developed for its SGIg Safety Needle Sets. (ECF No. 21 ¶ 21.) The '703 Patent issued from Provisional Application No. 61/130,880 and related Patent Application No. 12/187,256. (ECF No. 21 ¶ 21.) EMED alleges the invention claimed in the '703 Patent allows for the safe removal of needles from patients and the safe disposal of needles and needle sets. (ECF No. 21 ¶ 22.) Specifically, EMED alleges the invention "solves the needle safety problem by sheathing the needle within a protective pair of folding wings upon removal." (ECF No. 21 ¶ 22.)

In addition to selling needle sets, EMED alleges it also developed Infusion Extension Sets and an Infusion Pump. (ECF No. 21 ¶ 23.) EMED alleges that it manufactures and sells Infusion Extension Sets that were cleared by the FDA in January 1994 and can be used with any infusion apparatus and application. (ECF No. 21 ¶ 23.) More recently, EMED alleges it has developed a variable rate control Infusion Extension Set, the "VersaRate" set, which offers significant clinical benefits to patients. (ECF No. 21 ¶ 23.) EMED has also developed the SCIg60 Infusion Pump ("SCIg60 Pump"), which EMED alleges is an improved version of an infusion pump distributed and used in the market for the last twenty years. (ECF No. 21 ¶ 24.) According to RMS, however, the SCIg60 Pump uses a coiled spring, which results in higher pressures at the beginning of the infusion and lower pressures at the end, in comparison to the Freedom60 Pump, which maintains a constant pressure from start to finish. (ECF No. 14 ¶ 21.) While the SCIg60 Pump has obtained European and Canadian registration, it is currently under review by the FDA and thus not sold in the United States. (ECF No. 21 ¶ 24.)

C. FDA Clearance and Approval

The FDA prohibits device manufacturers from producing or marketing a medical device without FDA approval or clearance. (ECF No. 152-1 at 7.) Federal law requires medical device manufacturers to notify the FDA of their intent to market a device. 21 C.F.R. § 807.92(a)(3)). Manufacturers can satisfy this notification requirement either through FDA clearance or FDA approval. (ECF No. 152-1 at 5.) There are three categories of devices considered by the FDA in this process: Class I, Class II, and Class III. (ECF No. 152 at 7–8.) Device manufacturers of Class I (subject to numerous and pervasive regulatory controls) and Class II (subject to Class I controls and additional regulatory controls) devices can obtain premarket clearance prior to production or manufacturing. (ECF No. 152-1 at 8.) In order to produce or market Class III devices, manufacturers are required to file a premarket approval application ("PMA"), which is a long, costly process that involves rigorous premarket review and testing. (ECF No. 152-1 at 7–8.) Class III devices are explicitly intended for supporting and sustaining human life or preventing impairment of human health, or are devices that present a potential unreasonable risk of illness or injury. 21 U.S.C. § 360C(a)(1)(C)(ii).

A device manufacturer can obtain FDA clearance for Class I and Class II devices through a 510(k) filing, which is a filing that must demonstrate that the device is "at least as safe and effective, that is, substantially equivalent, to a legally marketed device." (ECF No. 152-1 at 5–6 (quoting FDA, Medical Devices, Premarket Notification 510(k), http://www.fda.gov/medicaldevices/deviceregulationandguidance/ howtomarketyourdevice/premarketsubmissions/premarketnotification510k/).) As the FDA explains, "[a] device is substantially equivalent if, in comparison to a predicate it: has the same intended use as the predicate; and has the same technological characteristics as the predicate; or has the same intended use as the predicate; and has different technological characteristics and the information submitted to the FDA[] does not raise new questions of safety and effectiveness." (ECF No. 42-1 at 4, Exhibit A (excerpting a description of the 510(k) process from the FDA's website).) *See also* 21 C.F.R. § 807.92(a) (describing the elements to be included in a 510(k) summary).

If a Class III device is dissimilar from existing approved devices such that 510(k) clearance is improper, the manufacturer must apply for FDA premarket approval. (ECF No. 152-1 at 8.) "[C]*learance* is the FDA term applied to devices which the FDA has determined are substantially equivalent to existing devices already in the marketplace; *approval* is the FDA term applied to [a] device that has been reviewed and vetted to the highest degree." (ECF No. 152-1 at 8.)

### D. The Parties' Underlying Claims

In the original complaint and countercomplaint respectively, RMS and EMED both claim that the other party made false and deceptive statements regarding either its own or the other party's products. (ECF No. 14; ECF No. 21.) For example, in its complaint, RMS alleges that EMED sells "knock-off" flow control tubing that is non-compatible with its Freedom60 Pump and that EMED specifically and improperly markets its tubing as equivalent to Freedom60 Tubing. (ECF No. 14 ¶ 22.) RMS also alleges that EMED falsely and deceptively refers to its knock-off flow control tubing as an "extension set," even though it is only a couple inches in length. (ECF No. 14 ¶¶ 23–24.) Moreover, RMS alleges that in early 2012, EMED began falsely advertising that its SCIg60 Pump and needle sets were equivalent, and even superior, to RMS's Freedom60 Pump and HIgH-Flo Safety Needle Sets. (ECF No. 14 ¶ 26.) For example, RMS claims that EMED misleadingly stated that "RMS sets do not offer any improved fluidics or higher flow than EMED sets" and that "[t]he Freedom60 pump is being operated around the limits of its ratings which make it unable to perform adequately with longer sets." (ECF No. 14 ¶ 27.) Further, RMS alleges that EMED falsely informed RMS's customers, suppliers, and buyers that RMS's needles are less smooth than EMED's needles and contain imperfections. (ECF No. 14 ¶ 30.)

Conversely, in its countercomplaint, EMED alleges that RMS made misrepresentations regarding EMED's Infusion Extension Sets, Infusion Pump, and SCIg Safety Needle Sets. (ECF No. 21 at 22–36.) Specifically, EMED alleges that RMS falsely represented to its customers that using non-RMS tubing with the Freedom60 Pump could result in uncontrolled flows that could lead to patient injury or death. (ECF No. 21 ¶ 62.) EMED alleges that its Infusion Extension Sets

6

can be used with the Freedom60 Pump, and that RMS's misrepresentations directly affected EMED's business. (ECF No. 21 ¶¶ 65–66.) Moreover, EMED alleges that RMS falsely represented that EMED's SCIg60 Pump is unsafe, can cause serious injury, and is not reimbursable by Medicare. (ECF No. 21 ¶¶ 80–90.) EMED further alleges that RMS falsely claims that its HIgH-Flo Safety Needle Sets have better flow characteristics than EMED's SCIg Safety Needle Sets (ECF No. 21 ¶ 36), and that SCIg Safety Needle Sets are dull and damage patients' skin (ECF No. ¶ 51).

In addition to the parties' numerous alleged misrepresentations, EMED also contends that RMS has infringed the '703 patent. (ECF No. 10 ¶ 38; ECF No. 21 at 36.) On May 1, 2013, EMED sent RMS a letter accusing RMS's HIgH-Flo Safety Needle Sets of infringing the claims of filed Patent Application No. 12/187,256. (ECF No. 21 at 6.) The letter demanded that RMS discontinue making and selling its HIgH-Flo Safety Needle Sets. (ECF No. 10 ¶ 38; ECF No. 21 at 6.) On August 21, 2013, EMED sent RMS another letter, informing RMS that the '703 Patent had issued and reiterating EMED's previous demands, and further threatening to seek treble damages for willful infringement. (ECF No. 10 ¶ 40; ECF No. 21 at 7.)

## II.    PROCEDURAL BACKGROUND

In response to EMED's letters, RMS filed this suit on September 20, 2013, seeking a declaratory judgment of non-infringement of the '703 Patent and a declaratory judgment of patent invalidity of the '703 Patent. (ECF No. 2 ¶¶ 8–11.) On December 6, 2013, RMS filed its First Amended Complaint. (ECF No. 14.) RMS brought eight claims: (1) patent infringement of the '703 patent in violation of 35 U.S.C. § 271; (2) patent invalidity of the '703 patent in violation of 35 U.S.C. §§ 102, 103, and 112; (3) federal false advertising in violation of 15 U.S.C. § 1125(a); (4) state-law false advertising in violation of Cal. Bus. & Prof. Code § 17500; (5) trade libel in violation of Cal. Civ. Code § 3294; (6) commercial defamation of character in violation of Cal. Civ. Code § 3294; (7) tortious interference with prospective economic relationships in violation of Cal. Civ. Code § 3294; and (8) unfair competition in violation of Cal. Bus. & Prof. Code § 17200. (ECF No. 14.) On January 7, 2014, EMED filed an answer and counterclaim. (ECF No. 21.) EMED brought six counterclaims: (1) patent infringement of the '703 patent in violation of

35 U.S.C. § 271(a); (2) federal false advertising in violation of 15 U.S.C. § 1125(a); (3) state-law false advertising in violation of Cal. Bus. & Prof. Code § 17500; (4) trade libel in violation of Cal. Civ. Code § 3294; (5) commercial defamation of character in violation of Cal. Civ. Code § 3294; (6) interference with prospective economic relationships in violation of Cal. Civ. Code § 3294; and (7) unfair competition in violation of Cal. Bus. & Prof. Code § 17200. (ECF No. 21.)

In September 2014, EMED filed a motion for preliminary injunction, requesting that the Court prohibit RMS from "making or publishing any false, unlawful, or misleading statements about EMED's rate sets in any media or to any person" (ECF No. 41-1 at 25–26), which this Court granted (ECF No. 68). This injunction enjoined RMS entities and persons from advertising, publicly disseminating, or making statements for a commercial advantage that: (1) only RMS rate sets (flow rate control tubing sets) have FDA clearance for use with the Freedom 60; (2) only RMS rate sets (flow rate control tubing sets) may be safely used with the Freedom 60; (3) the warranty on the Freedom 60 is conditioned upon use of RMS rate sets (flow rate control tubing sets); or (4) are otherwise inconsistent with the 510(k) issued by the FDA for the devices at issue in this case, including: the 510(k) issued in January 1994 (No. K935642); the 510(k) issued in December 2012 (No. K123729) for the VersaRate; and the 510(k) issued in May 2014 (No. K140133) for Infusets. (ECF No. 68 at 23.) In March 2016, EMED filed a second motion for preliminary injunction requesting the Court enjoin RMS from selling three allegedly misbranded products in California (ECF No. 83), which this Court denied (ECF No. 149).

RMS alleges that at the time the Court issued the preliminary injunction against RMS, the materials in EMED's May 2014 510(k) were largely unknown. (ECF No. 152-1 at 6.) RMS alleges that discovery and deposition testimony in this case and a separately filed trade complaint that RMS filed with the FDA against EMED ("Trade Complaint") provide new information regarding the original 510(k) submission. (ECF No. 152-1 at 6.) RMS alleges that in the July 25, 2017 Trade Complaint, RMS disputed the appropriateness of EMED's Infuset 510(k) and other EMED 510(k)s and presented proof that EMED is misleading consumers by selling and promoting devices beyond the scope of its 510(k). (ECF No. 152-1 at 6.) RMS seeks to use the Trade Complaint to demonstrate "a pattern of conduct by which EMED publicly makes untrue

statements that are designed to secure an improper commercial advantage." (ECF No. 152-1 at 7.)  In response to the discovery pertaining to the 510(k) issued for the Infuset K140133, on August 22, 2017, RMS filed the instant motion for a reciprocal preliminary injunction to enjoin EMS from making false statements and preserve the status quo until the case is fully resolved.  (ECF No. 152.)  On September 21, 2017, EMED filed a response to RMS's motion for preliminary injunction.  (ECF No. 157.)

### III.    STANDARD OF LAW

A temporary restraining order is an extraordinary and temporary "fix" that the court may issue without notice to the adverse party if, in an affidavit or verified complaint, the movant "clearly show[s] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).  The purpose of a temporary restraining order is to preserve the status quo pending a fuller hearing.  See Fed. R. Civ. P. 65.  It is the practice of this district to construe a motion for temporary restraining order as a motion for preliminary injunction.  Local Rule 231(a); *see also Aiello v. One West Bank*, No. 2:10-cv-0227-GEB-EFB, 2010 WL 406092 at *1 (E.D. Cal. Jan. 29, 2010) ("Temporary restraining orders are governed by the same standard applicable to preliminary injunctions.") (internal quotation marks and citations omitted).

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Costa Mesa City Emps.' Ass'n v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a trial.") (internal quotation marks omitted); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.") (internal quotation marks omitted).  In cases where the movant seeks to alter the

status quo, a preliminary injunction is disfavored and a higher level of scrutiny must apply. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). A motion for a preliminary injunction is not automatically denied simply because the movant seeks to alter the status quo, but instead the movant must meet a heightened standard of scrutiny. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a movant's motion for preliminary injunction, a district court may weigh the movant's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the movant shows that there are "serious questions on the merits . . . so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, a movant must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply in the [movant's] favor," in order to succeed in a request for preliminary injunction. *Id.* at 1134–35.

## IV. ANALYSIS

RMS seeks a reciprocal preliminary injunction prohibiting EMED from making false or misleading statements regarding the improper characterization of its SCIg60 Infusion System product as "FDA approved, when it has only been cleared." (ECF No. 152-1 at 18.) RMS alleges EMED has "misstated the contents and effect of the warning letter the FDA sent to RMS; submitted inaccurate and misleading data about its products to the FDA; and made false claims about its own products in its advertising and promotional materials." (ECF No. 152-1 at 18.) RMS argues EMED made at least four false statement claims which are representative of EMED's unlawful conduct: (1) EMED is intentionally misrepresenting FDA clearance as FDA approval (ECF 152-1 at 7); (2) EMED is intentionally misrepresenting the nature of the FDA's

February 26, 2016 Warning Letter (ECF No. 152-1 at 9); (3) EMED promotional materials present flow rate data inconsistent with the data submitted to the FDA (ECF No. 152-1 at 11); and (4) EMED is offering false and misleading statements to incite public concern.  (ECF No. 152-1 at 16.)

EMED responds with three arguments.  First, EMED argues RMS's misrepresentations concerning EMED's devices have caused EMED irreparable harm. (ECF No. 157 at 6.)  Second, EMED responds to RMS's motion for a preliminary injunction, arguing that: (1) contrary to RMS's argument, RMS does seek extraordinary relief (ECF No. 157 at 7); and (2) taken alone or in combination, the four types of alleged conduct complained of by RMS do not warrant injunctive relief (ECF No. 157 at 11).  RMS replied, arguing: (1) EMED does not dispute that a preliminary injunction is in the public interest or that the equities tip in RMS's favor (ECF No. 159 at 2); (2) RMS is likely to succeed on the merits of its claims (ECF No. 159 at 2); and (3) RMS will suffer irreparable injury without a preliminary injunction (ECF No. 159 at 7).

To succeed on its motion, RMS must make a showing on all four elements of the Winters test.  *Alliance for the Wild Rockies*, 632 F.3d at 1135.  The Court therefore addresses each prong of the injunctive relief analysis in turn.

A.  Whether RMS is likely to succeed on the merits of its claims

*i. Whether EMED is intentionally misrepresenting FDA clearance as FDA approval*

RMS alleges EMED is intentionally misrepresenting FDA clearance as FDA approval. (ECF No. 152-1 at 7.)  EMED responds that the allegation that it intentionally misrepresented FDA clearance as FDA approval does not warrant injunctive relief.  (ECF No. 157 at 6.)

RMS alleges EMED "intentionally and repeatedly falsely boasted that its medical devices are '[a]pproved' by the FDA."  (ECF No. 152-1 at 7.)  RMS further alleges that, "by intentionally misconstruing a device as having FDA approval, EMED is artificially and improperly elevating the device by implicitly claiming that it has been approved by the FDA as safe and effective for the intended use in compliance with mandatory Class III controls."  (ECF No. 152-1 at 9.) False advertising under Cal. Bus. and Prof. Code § 17500 "makes it unlawful for a business to

disseminate any statement 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.'" *Ariz. Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Int'l, Inc.*, 421 F.3d 981, 985 (9th Cir. 2005) (citing Cal. Bus. & Prof. Code § 17500). To succeed on a claim for intentional misrepresentation under §§ 17200 and 17500, a plaintiff must prove that the defendant's statements are misleading to a reasonable consumer. *Haskell v. Time, Inc.*, 965 F. Supp. 1398, 1406–07 (E.D. Cal. 1997). Under the reasonable consumer standard, a "plaintiff is required to show not simply that the defendants' bulletins *could* mislead the public, but that they were *likely* to mislead the public." *Id.; see also Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995). Anecdotal evidence alone is insufficient to prove that the public is likely to be misled. *William H. Morris Co. v. Group W. Inc.*, 66 F.3d 255, 258 (9th Cir. 1995). To prevail, a "plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers." *Haskell*, 965 F. Supp. at 1407.

RMS provides the declaration of an FDA expert to support its claim. (ECF No. 152-1 at 9; ECF No. 152-5.) RMS summarizes the FDA expert's declaration stating, "to the consumer and public at large, an assertion of FDA approval carries with it the implied statement that the product has been subjected to intense review and scrutiny, and the costs of time and resources associated therewith." (ECF No. 152-1 at 9.) However, RMS fails to provide any extrinsic evidence that the statements made by EMED tended to mislead customers into thinking that a product had undergone intense review and scrutiny when in fact it had not. A plaintiff must proffer extrinsic evidence in order to qualify for a preliminary injunction in this context, and RMS has only provided the generic declaration of the FDA expert.[1] *Haskell*, 965 F. Supp. at 1406–07; (ECF No. 152-1 at 7–9). *See also William H. Morris Co.*, 66 F.3d at 258 (finding that the plaintiff failed to meet its burden of demonstrating that a "*significant* portion" of recipients were misled by the defendant's letter because plaintiff's evidence consisted solely of the testimony of two of 300

---

[1]    The FDA expert's declaration reiterates the FDA's clearance and approval process. (ECF No. 152-5.) The declaration states, "RMS has not been restrained or enjoined in any manner from continuing to manufacture, distribute, or sell any of its medical devices." (ECF No. 152-5 at 4.) The FDA expert's declaration does not describe how EMED's alleged conduct misled customers into thinking that a product had undergone intense review and scrutiny when in fact it had not. (ECF No. 152-5.)

recipients, of the company president, and of an employee who had received phone calls from confused recipients). Without consumer survey information or other specific examples of consumers being misled, the vague anecdotal evidence alone submitted by RMS is insufficient to prove that the public is likely to be misled by EMED's statements. *Haskell*, 965 F. Supp. at 1406–07; *William H. Morris Co.*, 66 F.3d at 258.

Accordingly, RMS has failed to allege sufficient facts to demonstrate a likelihood that it would prevail on the merits of its claim for intentional misrepresentation based on EMED's alleged statements.

> *ii. Whether EMED is intentionally mispresenting the nature of the FDA's Warning Letter*

RMS alleges EMED is intentionally misrepresenting the nature of the FDA's Warning Letter[2] by stating there will be a shortage in the supply chain as a result of the Warning Letter. (ECF No. 152-1 at 9.) EMED responds that RMS fails to clearly identify any actual statement mispresenting "the nature" of the FDA's Warning Letter to RMS. (ECF No. 157 at 18.)

To prevail on a claim for intentional misrepresentation, a "plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers." *Haskell*, 965 F. Supp. at 1407; *William H. Morris Co.*, 66 F.3d at 258.

RMS received the Warning Letter from the FDA in response to an inspection of RMS facilities by an FDA investigator. (ECF No. 152-7 at 2.) The FDA investigator noted adulteration/misbranding violations, quality system violations, and medical device reporting violations, and included descriptions of these violations in the Warning Letter. (ECF No. 152-7 at 3.) In part, the Warning Letter states, "[t]he FDA requests that your firm immediately cease activities that result in the misbranding or adulteration of the aforementioned Freedom 60 and Freedom Edge Syringe Infusion Pumps and RMS HiGH-Flo Subcutaneous Safety Needle Sets, such as the commercial distribution of the devices." (ECF No. 152-7 at 4.) In March 2016, Mr. Barbrie, an EMED executive, wrote an email referencing the Warning Letter which stated in part,

---

[2]      "As part of its mission to protect the public health, the FDA conducts inspections [and] regularly issues warning letters when issues of possible concern appear relevant." (ECF No. 152-1 at 9.) "FDA warning letters raise issues, but they are not actionable decrees." (ECF No. 152-1 at 9.)

"[i]n light of the FDA's request, there will undoubtedly be a void in the supply chain." (ECF No. 157 at 20.) RMS alleges that as EMED is aware, "a warning letter is not an ultimate finding of fact; it is a communication from the FDA that may occur for a variety of reasons and is intended to place the receiving party on notice of issues, which require examination, discussion, and potential remediation." (ECF No. 152-1 at 9.)

RMS argues, "EMED's continual promotion of the Warning Letter as an unquestioned finding of fact against RMS is entirely improper." (ECF No. 152-1 at 10.) However, RMS fails to provide evidence of how the alleged "continual promotion" by EMED has confused or deceived consumers. (ECF No. 152-1); *Haskell*, 965 F. Supp. at 1406–07. RMS fails to provide customer surveys or other concrete evidence of public confusion that allegedly resulted from Mr. Barbie's email or other "continual promotion." *William H. Morris Co.*, 66 F.3d at 258; (ECF No. 152-1 at 9–10.)

Accordingly, RMS has failed to allege sufficient facts to demonstrate a likelihood that it would prevail on the merits of its claim regarding whether EMED is intentionally misrepresenting the nature of the FDA's Warning Letter.

*iii. Whether EMED's promotional materials present flow rate data inconsistent with Infuset K140133 510(k) clearance*

RMS alleges EMED's promotional materials present flow rate data inconsistent with the Infuset K140133 510(k), in violation of the California's False Advertising Law ("FAL") and Unfair Competition Law ("UCL"). (ECF No. 152-1 at 11, 17.) Specifically, RMS alleges that "[f]or marketing purposes, EMED has developed an information sheet for the Infuset extension set which once again presents different performance data than that submitted to FDA." (ECF No. 152-1 at 14.) Essentially, RMS alleges, the data provided to the FDA for clearance purposes differs from the data provided to customers for marketing purposes. (ECF No. 152-1 at 14.) EMED argues RMS has failed to demonstrate a likelihood of prevailing on the merits on RMS's allegation that EMED promotional materials present flow rate data inconsistent with the 510(k). (ECF No. 157 at 22.)

Claims under California's UCL or FAL prevail if EMED has engaged in "any unlawful,

14

unfair or fraudulent business act or practice [or] unfair, deceptive, untrue or misleading

advertising." Cal. Bus & Prof Code § 17200. In order to prevail on said claim, RMS must "(1)

establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e.,

*economic injury*, and (2) show that the economic injury was the result of, i.e., *caused by*, the

unfair business practice or false advertising that is the gravamen of the claim." *Bower v. AT&T*

*Mobility, LLC*, 196 Cal. App. 4th 1545, 1554 (2011) (citing *Kwikset Corp. v. Superior Court*, 51

Cal. 4th 310, 322 (2011)).

For claims under Cal. Bus. & Prof. Code §§ 17500 and 17200, California courts recognize

that:

> any violation of the false advertising law . . . necessarily violates the
> UCL. [They] have also recognized that these laws prohibit not only
> advertising which is false, but also advertising which although true,
> is either actually misleading or which has a capacity, likelihood or
> tendency to deceive or confuse the public. Thus, to state a claim
> under either the UCL or the false advertising law, based on false
> advertising or promotional practices, it is necessary only to show that
> members of the public are likely to be deceived.

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950–51 (2002) (internal quotation marks, alterations, and

citations omitted).

RMS alleges, "EMED cannot be allowed to assert a lower flow rate in an advertising

context that is at odds with a higher flow rate asserted by the higher pressure as described to the

FDA." (ECF No. 152-1 at 15.) Flow rate is the amount of fluid which passes per unit of time.

(ECF No. 152-1 at 11.) "With infusion therapy, medications are typically prescribed to be

administered as a specific volume over a specific period of time, and delivery that is too fast or

too slow may have significant, if not dire, consequences to the patient." (ECF No. 152-1 at 11.)

RMS alleges there is a disparity between the FDA 510(k) disclosure and the Infuset marketing

material that is "self-evident." (ECF No. 152-1 at 15.) RMS alleges EMED is "mischaracterizing

and overstating" the applicability of the FDA's 510(k) clearance. (ECF No. 152-1 at 15.) RMS

further alleges EMED improperly sought FDA clearance for its Infusets when EMED should have

sought FDA approval. (ECF No. 152-1 at 15.) RMS alleges the promotional flow rate materials

developed by EMED for marketing purposes are different than the flow rate data EMED submitted to the FDA.  (ECF No. 152-1 at 14.)  Specifically, the operating pressure and flow rate range for EMED's SCIg60 infusion system compared to operating pressure and flow range for RMS's FREEDOM60 Infusion System is recorded differently for marketing and compliance purposes.  (ECF No. 152-1 at 14.)  RMS concludes that "[e]ven the average person can understand from EMED's own submission that EMED Infusets and RMS Freedom systems have different ranges or flow rates."  (ECF No. 152-1 at 15.)

In response, EMED states, "RMS's Motion does not present survey or other sufficient evidence that a significant portion of the consuming public were actually deceived by the flow rates."  (ECF No. 157 at 24.)  The Court finds EMED's arguments persuasive; RMS failed to provide concrete evidence of how the alleged mischaracterization misled or confused the public. While an average person may understand the flow rates are different, RMS has provided no information as to how this understanding confuses, misleads or deceives customers.  *See Ariz. Cartridge Remanufacturers Ass'n, Inc.*, 421 F.3d at 985 (citing Cal. Bus. & Prof. Code § 17500) (holding that "injunctive relief requires a showing that members of the public are likely to be deceived"); *Kasky*, 27 Cal. 4th at 951 (finding that false advertising in promotional practices requires a showing that members of the public are likely to be deceived).  Further, in its briefings, RMS has provided no evidence it has suffered economic loss that was caused by the alleged false advertising.  (*See* ECF No. 152-1; ECF No. 159); *Bower*, 196 Cal. App. 4th at 1554 (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011)).

Accordingly, RMS has failed to allege sufficient facts to demonstrate a likelihood that it would prevail on the merits of its false advertising claim regarding whether EMED's promotional materials present flow rate data inconsistent with the Infuset K140133 510(k).

> *iv. Whether EMED is offering false and misleading statements constituting false advertising to incite public concern*

RMS alleges EMED is offering false and misleading statements to incite public concern in violation of the Lanham Act.  (ECF No. 152-1 at 13–14.)  EMED responds that RMS has not demonstrated its entitlement to a preliminary injunction based on RMS's allegation that EMED is

16

offering false and misleading statements to incite public concern.  (ECF No. 157 at 24.)

The Lanham Act is a federal statute that governs trademarks, unfair competition, and false advertising.  15 U.S.C. § 1051 et. seq.  To succeed on a Lanham Act claim for false advertising, the plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about his own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material; (4) the defendant caused its false statement to enter interstate commerce; (5) the plaintiff has been or is likely to be injured.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  The Ninth Circuit Court of Appeals has distinguished between puffery and misrepresentation.  *See Or. Pub. Emps. Ret. Fund. v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  Material misrepresentations are not "puffery" but rather, are objectively true or false, and subject to objective verification.  *Id.*  Puffery, however, concerns expressions of opinions, "as opposed to knowingly false statements of fact."  *Id.*  Puffery "hardly amounts" to a material misstatement or misrepresentation.  *Id.*  Statements by a company that are capable of objective verification are not "puffery" and can constitute material misrepresentations.  *See SEC v. Todd*, 642 F.3d 1207, 1216–17 (9th Cir. 2011) (finding that a defendant's accounting calculation of the financial impact of a transaction was objective and thus a material misrepresentation).

In a statement posted on FDA Webview, an online blog providing commentary on FDA matters, EMED CEO Paul Lambert wrote:

> RMS has been cited by the FDA for numerous regulatory infractions, some of which have potential impact on patient health and safety. . . . While RMS may snub its nose at the FDA, the deficiencies uncovered by the FDA are serious business.  To complete the record, RMS is also a defendant in lawsuits being brought by EMED Technologies alleging that RMS has been consistently infringing patents created and controlled by EMED, to the detriment of the healthcare consumer.

(ECF No. 152-1 at 16.)  RMS alleges Mr. Lambert intentionally used "inflammatory phrases" and that "he was clearly aware that not only has there been no finding of infringement, but that both of the patents at issue stand at present as invalid."  (ECF No. 152-1 at 16.)

Mr. Lambert's statement includes both opinions *and* statements capable of objective verification. (*See* ECF No. 152-1 at 16.) Mr. Lambert's opinions cannot constitute a material misrepresentation because they cannot be objectively verified. *SEC*, 642 F.3d at 1216–17. Mr. Lambert's statements which are capable of objective verification can be verified by evidence provided by the parties in their briefings and exhibits. (ECF No. 152-7 at 3–4.) For example, on February 26, 2016, the FDA sent a warning letter to Andrew Sealfon, CEO of RMS. (ECF No. 152-7.) The letter raised several adulteration and misbranding violations, that "could significantly affect safety and effectiveness" of RMS products. (ECF No. 152-7 at 3.) The letter stated, "[t]he FDA requests that your firm immediately cease activities that result in the misbranding or adulteration of the aforementioned Freedom 60 . . . such as the commercial distribution of devices for the uses discussed above." (ECF No. 152-7 at 4.) The Warning Letter supports Mr. Lambert's statement that "RMS has been cited by the FDA for numerous regulatory infractions, some of which have potential impact on patient health and safety," demonstrating the statement is not objectively false. *Southland Sod Farms*, 108 F.3d at 1139; (ECF No. 152-7 at 3.).

Next, RMS directs the Court to the declaration of Dr. Fred Ma, RMS Chief Medical Officer. (ECF No. 152-1 at 10.) Dr. Ma states, "[t]he purpose of a warning letter is to advise a manufacturer of potential issues and to encourage voluntary correction and resolution of the concerns the agency raises." (ECF No. 152-8 ¶ 11.) Further, "[a]n FDA warning letter is not an enforcement action." (ECF No. 152-8 ¶ 14.) Relying on this declaration, RMS alleges EMED's statement is false and misleading because it is designed to give the impression that the FDA took enforcement action against RMS when all the FDA actually did was issue RMS a warning letter. (ECF. No. 152-1 at 10.) RMS alleges EMED's statements were made to incite public concern, however, RMS does not provide explanation or evidence of how the statement actually deceived or has the tendency to deceive a substantial segment of consumers. (*See* ECF No. 152-1 at 16–17.) Without such evidence, the Court cannot conclude that the public was confused or misled by Mr. Lambert's comments. *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606.

Accordingly, RMS has failed to allege sufficient facts to demonstrate whether EMED is

offering false and misleading statements to incite public concern.  RMS has made an insufficient showing to demonstrate a likelihood of success on the merits.  (ECF No. 152-1; ECF No. 159.)

B.   Balance of equities

A party moving for a preliminary injunction must prove "that the balance of equities tips in his favor." *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014).  A court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod.-Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

In the prior preliminary injunction issued against RMS, this Court found the balance of hardships tipped sharply in EMED's favor.  (ECF No. 68 at 18.)  The Court determined EMED produced evidence that RMS's false or misleading statements elicited negative customer response as evidenced by December 2012 customer emails.  (ECF No. 68 at 18.)  EMED alleged that it lost a major customer, that its revenue declined, and that customers requested that EMED sign indemnity agreements before completing purchases.  (ECF No. 68 at 18.)  The Court found an injunction would cause RMS minimal to no hardship.  (ECF No. 68 at 19.)

In the instant motion for reciprocal preliminary injunction, RMS fails to provide any similar evidence.  (*See* ECF No. 152-1.)  RMS instead alleges that the declaration of a senior company executive confirms that RMS has suffered substantial loss due to EMED's conduct.  (ECF No. 152-1 at 19.)  RMS states that the specific numbers are difficult if not impossible to quantify but claims that it is clear that EMED's pattern of false statements has cost RMS substantial business and market share.  (ECF No. 152-1 at 19.)  This statement is insufficient and demonstrates why RMS has, once again, not met its burden.  In *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 310 (1982), the United States Supreme Court found a preliminary injunction to be inappropriate when the nonmoving party had not caused "appreciable harm."  Without concrete evidence of these alleged economic losses or customer comments or emails constituting appreciable harm, RMS has failed to demonstrate "claims of injury." *Amoco Prod.-Co.*, 480 U.S. at 542; *Weinberger*, 456 U.S. at 307–08.  Without a showing of injury, the Court does not find that the balance of equities tips sharply in favor of RMS. *Arc of Cal.*, 757 F.3d at 983.

C.  <u>Irreparable injury absent a preliminary injunction</u>

RMS alleges it will suffer irreparable injury if this Court does not grant the motion for a preliminary injunction because EMED's false statements "continue to irreparably damage not only the goodwill and reputation of RMS as a company, but also the reputation of its particular products." (ECF No. 152-1 at 19.)  In EMED's response, it argues "RMS failed to provide actual consumer evidence of being misled, confused, or deceived." (ECF No. 157 at 11.)

"A plaintiff seeking a preliminary injunction must establish . . . . that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.  The threat of the loss of prospective customers, goodwill, or reputation supports a finding of irreparable injury. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001).

RMS relies on *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 454 (S.D.N.Y. 2001) to allege EMED's statements have diminished the "product's value in the minds of the consumer." (ECF No. 152-1 at 19.)  In *Reckitt*, the District Court for the Southern District of New York relied on precedent from the Second Circuit Court of Appeals to find that "[a] misleading comparison to a specific competing product . . . diminishes that product's value in the minds of the consumer." *Reckitt Benckiser Inc.*, 760 F. Supp. 2d at 454 (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988).  The court emphasized that its holding rested on the fact that the parties were in an "uncertain regulatory climate" and "in a new market, where it would be difficult to quantify either party's lost sales." *Id.*

The Court does not find RMS's application of *Reckitt* to the case at hand persuasive. *Reckitt* was decided by another District Court and relies on precedent from the Second Circuit Court of Appeals, which is not binding on this Court.  Moreover, neither RMS nor EMED have demonstrated in their briefings that they are competing in an effectively new market or within an uncertain regulatory climate — factors which the court in *Reckitt* specifically emphasized.  To the contrary, here, RMS emphasized the rigidity of the *existing* FDA framework — the longstanding regulatory schedule — for pre-market clearance and approval. (ECF No. 152-1 at 9.)  RMS

alleges EMED's statements have diminished "the product's value in the minds of the consumer," pointing to the declaration of a senior company executive to confirm that RMS has suffered substantial losses. (ECF No. 152-1 at 19.) However, the executive's declaration does not reference or allude to any specific dissatisfied customers. (*See* ECF No. 152-10.) The executive's declaration only references a loss of substantial business and market share, without providing a numerical estimation or other data regarding specific business losses. (ECF No. 152-10 at 4.)

Moreover, to establish this prong of the *Winter* test, RMS must show more than a "possibility of irreparable harm." *Winter*, 555 U.S. at 22. Without more concrete allegations, RMS has failed to meet this burden. Finding in RMS's favor would be contrary to *Winter* and to the Supreme Court's characterization of injunctive relief "as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Here, RMS has failed to identify any specific irreparable injury that is not only possible, but even likely. *Id.* Accordingly, RMS's argument on this issue fails.

### D. Public interest

A plaintiff seeking a preliminary injunction must show that the injunction is in the public interest. *Arc of Cal.*, 757 at 983; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009). With due consideration to the allegations presented by both parties at this stage in the proceedings, the Court finds that a preliminary injunction will not serve the public interest because there is insufficient evidence that the dissemination of untrue, misleading, or unfair statements is occurring.

### V.  CONCLUSION

This Court hereby declines to issue a preliminary injunction against EMED. Plaintiff's motion for a preliminary injunction is hereby DENIED.

Dated: March 28, 2019

Troy L. Nunley
United States District Judge